FORUM FINANCIAL GROUP, Limited Liability Company and John Y. Keffer, Plaintiffs

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, Jonathan R. Hay and Andrei N. Shleifer, Defendants

No. 00–306–P–C.

United States District Court, D. Maine.

Nov. 19, 2001.

Peter J. Detroy, III, Norman, Hanson & Detroy, Portland, Stephen R Delinsky, Esq., Michael J. Flammia, Esq., Peter F. Carr, II, Esq., Eckert, Seamans, Cherin & Mellott, Boston, MA, for Forum Financial Group, Limited Liability Company, John Y Keffer, plaintiffs.

Richard L. O'Meara, Barbara T. Schneider, Esq., Murray, Plumb & Murray, Robert S. Frank, Esq., Harvey & Frank, Portland, Lawrence S. Spiegel, Esq., David M. Zornow, Esq., Kadden, Arps, Slate, Meagher & Flov, New York, NY, Joseph H. Groff, III, Jensen, Baird, Gardner & Henry, Portland, for President and Fellows of Harvard College, Jonathan R Hay, Andrei N Shleifer, defendants.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

GENE CARTER, District Judge.

Plaintiffs Forum Financial Group, LLC and John Y. Keffer ("Plaintiffs") have filed a Complaint against the Defendants President and Fellows of Harvard College ("Harvard"), Jonathan R. Hay, ("Hay") and Andrei N. Shleifer ("Shleifer") (collectively "Defendants"), for claims arising out of a failed business transaction. Specifically, Plaintiffs assert claims for fraudulent misrepresentation, negligent misrepresentation, and tortious interference with prospective economic advantage against Hay

(Counts I, III, and V); Plaintiffs assert claims for aiding and abetting fraudulent misrepresentation, aiding and abetting negligent misrepresentation, and aiding and abetting tortious interference with prospective economic advantage against Shleifer (Counts II, IV, and VI); and Plaintiffs assert claims for vicarious liability and negligence against Harvard (Counts VII, VIII, and IX). Plaintiffs request both compensatory and punitive damages (Count X). Now before the Court are Defendants' Motions to Dismiss Or, In The Alternative, Transfer the case to the District of Massachusetts. For the reasons that follow, the Court will *DENY* Defendants' Motions to Dismiss and the Motion for Transfer of Venue.

## I. PROCEDURAL POSTURE

On October 24, 2000, Plaintiffs filed this action against Defendants. Defendants Shleifer filed a Motion to Dismiss on November 20, and Defendant Harvard filed a Motion to Dismiss, Or in the Alternative, Motion to Transfer on November 22, 2000. On December 21, 2000 Plaintiffs filed a Motion for Court–Ordered Service in regards to Defendant Hay. On December 13, 2000, Plaintiffs filed an Opposition to Defendants' Motions to Dismiss and requested discovery specifically related to jurisdiction. On January 24, 2001, Chief Judge Hornby denied without prejudice Defendants Shleifer's and Harvard's Motions to Dismiss for lack of personal jurisdiction, and granted Plaintiffs' request for discovery limited solely to personal jurisdiction issues over Defendants Harvard College and Andrei Shleifer. On February 16, 2001, Judge Hornby ordered court-directed service of process to be made on Defendant Hay. On April 6, 2001, Defendant Hay filed a Motion to Dismiss Plaintiffs' Complaint, alleging lack of personal jurisdiction, for ¨forum *non-conveniens,* and pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim for fraudulent and negligent misrepresentation (Counts I and III) and tortious interference with prospective economic advantage (Count V). Defendant Hay additionally contends that Plaintiffs failed to effect proper service upon him.[1] On July 20, 2001, Defendant Shleifer renewed his Motion to Dismiss for lack of personal jurisdiction or, in the alternative, to dismiss Count IV, aiding and abetting negligent misrepresentation (Count IV), for failure to state a claim upon which relief can be granted, and to dismiss Count VI for failure to join an indispensable party. On July 24, 2001, Defendant Harvard renewed its Motion to Dismiss on all grounds raised in the original motion except want of jurisdiction, including: the act of state doctrine, the effect of the release agreement, the application of the doctrine of immunity as a non-profit, charitable organization, for lack of vicarious liability, a claim of lack of duty, failure to plead with sufficient particularity in violation of Fed.R.Civ.P. 9(b), applica-

---

1. Chief Judge Homby recused himself by an Order of Disqualification (Docket No. 40) filed on April 27, 2001, because of an event occurring on April 20, 2001. Plaintiffs subsequently waived the disqualification (Docket No. 42) but the Defendants did not agree to such waiver. The case was subsequently reassigned for further action to the undersigned judge.

The record now before this Court is that which was before Chief Judge Homby plus the fruits of the limited discovery on the jurisdictional issues authorized by Judge Homby and the findings made subsequent to completion of that discovery. No party questions this Court's reliance on the discovery results in considering the recent motion to dismiss on the personal jurisdiction grounds. In fact, all parties have relied upon these materials in arguing their respective positions on these issues.

bility of punitive damages, or in the alternative, for transfer to the United States District Court for the District of Massachusetts. Additionally, Harvard has moved to dismiss pursuant to Fed. R.Civ.P. 19 for failure to join indispensable parties, namely the Russian Commission on Securities and Capital Markets ("Russian SEC"), and Dimitri Vasiliev. In the event that Shleifer and/or Hay are successful in their motions to dismiss, Harvard contends, under theories of vicarious liability, that Harvard's agents, Shleifer and Hay, are also indispensable parties. Defendants also adopt each other's arguments to the extent they apply to the individual claims of Defendants.[2]

## II. FACTS

The Plaintiffs' Complaint makes the following relevant factual assertions. Plaintiff Forum Financial Group, LLC ("Forum") is a Delaware limited liability company with a principal place of business at Two Portland Square, Portland, Maine. John Y. Keffer ("Keffer") is an individual residing in Cumberland, Maine, who is the owner of Forum. Forum is in the business of the administration and operation of mutual funds in the United States, Poland, Bermuda and Malta. Complaint ¶ 39. Forum's expertise includes the technical aspect of operations management, with a particular expertise in the operation and administration of mutual funds in foreign countries. Complaint ¶ 39. Forum was the first company to provide independent third-party fund administration services in Poland. Complaint ¶ 39. Defendant Harvard is a corporation incorporated under the laws of the Commonwealth of Massachusetts with a principal place of business in Massachusetts. Harvard received money from the United States Agency for International Development ("USAID") to provide strategic guidance to the capital market development effort in Russia and "to provide unbiased input into, and overall day-to-day management, review, and evaluation of, the privatization and market reforms."[3] Complaint ¶ 14. With USAID funds, Harvard conducted business in Russia as the Harvard Institute for International Development ("HIID" or "the Russia Program").

Defendant Andrei Shleifer is a United States citizen residing in Newton, Massachusetts. Shleifer is a tenured Professor in Harvard's Department of Economics. Complaint ¶ 8. In 1993, Harvard appointed Defendant Shleifer as Home Office Coordinator/Principle Investigator of its Russia Program. Harvard authorized Shleifer to act on Harvard's behalf concerning the Russia Program. Complaint ¶ 20. Shleifer had the authority and primary responsibility for creating, overseeing, and managing Harvard's Russia Program and insuring adherence to all of Harvard's obligations under the USAID agreements. Complaint ¶ 20. Defendant Jonathan R. Hay is a United States citi-

---

**2.** Although no party has objected to Keffer's standing as a Plaintiff in this case, the Court notes that the Complaint identifies Forum Financial Group, LLC ("Forum") as the corporate Plaintiff. It also identifies John Keffer as an owner of Forum, however the Court can find no further allegation set forth in the Complaint that would justify Mr. Keffer's standing as a Plaintiff in this case because of activities taken by or on behalf of Forum Financial Group, LLC. The Court is struck by the *lacunae* of allegations sufficient to estab-

lish a predicate for Mr. Keffer to claim damages on his personal behalf. The issue not having been raised by either party in the case, the Court makes no disposition.

**3.** The USAID agreements with Harvard further required Harvard and Harvard employees to be "a completely neutral third party, void of any vested interest in the contracting process." Complaint ¶¶ 14, 17.

zen currently residing in Moscow, Russia.[4] In 1993, Harvard hired Defendant Hay, Shleifer's former student, to work with Shleifer as Harvard's Field Associate in Russia. At Shleifer's recommendation, Harvard promoted Hay to General Director/Field Coordinator of the HIID Russia Program in Moscow. Complaint ¶ 21. Plaintiffs allege that "Hay reported directly to Shleifer and the two of them shared responsibility for management and control over Harvard's performance under the USAID Agreements. Their control included . . . identifying and retaining subcontractors [and] controlling the other USAID contractors" to accomplish the program objectives. Complaint ¶ 21. Harvard held out Shleifer and Hay as competent and qualified to direct the Russia Program. Complaint ¶ 22. Plaintiffs allege that Shleifer and Hay, as employees, were agents of Harvard, with apparent authority to act within the scope of their employment on the Russia Program by, *inter alia*, subcontracting with businesses such as Forum, and exercising their authority over the USAID initiative in Russia. Complaint ¶¶ 136, 23. Shleifer and Hay used USAID funds to establish the Institute for Law–Based Economy ("ILBE"), a Russian nonprofit corporation.[5] Complaint ¶ 26.

Nancy Zimmerman ("Zimmerman") is Shleifer's wife. Elizabeth Hebert ("Hebert") was Hay's girlfriend during 1995 and 1996, and she is now Hay's wife. Complaint ¶ 3. Julia Zagachin ("Zagachin") was employed by HIID as a Russia Pro-

gram associate. Complaint ¶¶ 3, 51. Beginning in late 1995 or early 1996, Hay, Hebert, Shleifer, Zimmerman, and Zagachin put together a plan to launch the first Russian mutual fund and the first Russian specialized depository for their own personal profit. Complaint ¶ 35. Michael Butler, Esq. ("Butler") was hired by Harvard, pursuant to Hay's request, to work directly with Shleifer and Hay on Harvard's Russia Program.[6] Complaint ¶ 72.

## A. The Alleged Contract and Fraud

Dimitri Vasiliev ("Vasiliev") was Chairman of an entity identified as the Russian SEC. Complaint ¶ 31. Albert Sokin ("Sokin") was Vasiliev's political advisor. *Id.* The Russian SEC executed a contract (the "Contract") on July 25, 1996, with Forum Financial Group Consulting LLC ("Forum Consulting"), an entity created by Plaintiffs for the purpose of creating a mutual fund industry in Russia. Complaint ¶¶ 62, 67. Under that Contract, Forum Consulting was to assist the Russian SEC with developing and implementing a Russian mutual fund market. Forum Consulting established a new entity, Forum Financial Group Russia LLC ("Forum Russia"), in order to execute the First Russian Specialized Depository ("FRSD"), a management and custodian service company necessary to administer mutual funds. Complaint ¶ 62. Forum Russia was set up to own and operate the specialized depository; and Keffer and Forum proposed prospective Russian investors to own fifty-one percent of the FRSD, with Forum Russia

---

**4.** The Complaint speaks only of residence and citizenship. To the extent that the domicile of a Defendant would be relevant to or have weight in any jurisdictional determination of this Court, there simply is no sufficient predicate for the Court to consider any Defendant's domicile in making its determination.

**5.** It also is alleged that Shleifer and Hay caused Harvard (doing business as HIID) to

execute a contract with the Institute for Law–Based Economy ("ILBE") to provide economic and legal advice to the Russian government. Complaint ¶ 26.

**6.** Butler was also retained to represent Harvard, Shleifer, and Hay in the federal investigation concerning the administration of the Harvard Russia Program. Complaint ¶ 72.

retaining management control and forty-nine percent of the FRSD. Complaint ¶ 63.

Plaintiffs allege that Hay and Shleifer fraudulently conspired with Butler, Zimmerman, Zagachin, and Hebert to defraud Keffer and Forum of their ownership, control, and prospective economic advantage to be derived from Forum Consulting and Forum Russia. Complaint ¶ 3. Prior to Plaintiffs executing the Contract with the Russian SEC, Plaintiffs allege that Hay and others initiated contact, cultivated a relationship, and facilitated or orchestrated Plaintiffs receiving the Contract with the Russian SEC. In early March 1996, Vasiliev asked Keffer to allow Vasiliev's advisor, Hay, to visit Forum's offices in Poland. Complaint ¶ 44. Hebert and Zagachin actually appeared and toured Forum in Poland. Complaint ¶ 44. On March 18, 1996, Hay "further represented that Keffer and Forum would have management control and a substantial ownership interest in the specialized depository." Complaint ¶ 47. Plaintiffs believed that the Consulting Contract, based on Hay's assurances, "was an opportunity for Forum to earn revenues which would support at least a portion of the start-up costs associated with Forum maintaining a high-level staff in Russia to create and operate a specialized depository." Complaint ¶ 47. Defendants told Plaintiffs that their efforts would be funded by the World Bank for up to $2,500,000. Complaint ¶ 52. Hay, it is alleged, knew these representations were false. Complaint ¶ 47. Plaintiffs also allege that Shleifer and Hay improperly influenced Sokin and his associates by employing him in Harvard's Russia Program, by providing him with a housing allowance and car service, and by paying him an exorbitant salary funded with USAID funds.[7] Complaint ¶ 32. As of August 23, 1996, Keffer was unaware of Hay's alleged improper influence over Vasiliev, Sokin, and the Russian SEC. Complaint ¶ 76. Plaintiffs allege that Defendants fraudulently induced them by falsely promising Forum and Keffer that Forum would own and manage the first specialized depository after using their own resources to create it.[8] Complaint ¶¶ 3, 38.

Shleifer and Zimmerman traveled to Moscow to meet with Zagachin, Hebert, and Hay in early May 1996. Complaint ¶ 58. On May 13, 1996, the Russian SEC mailed to Forum in Maine written notification, on Russian SEC stationery and signed by a Harvard employee, that Forum's proposal had been selected by the Russian SEC, and Forum was requested to begin negotiating the terms of the Consulting Contract with the Russian SEC. Complaint ¶ 54. The day after Forum was informed that it would get the Contract with the Russian SEC, Hay, Hebert, Shleifer, and Zimmerman were all actively marketing the forthcoming specialized depository for sale to American investors.[9] Complaint ¶¶ 56, 57. This is the deposito-

---

7. These payments, it is alleged, were made to a foreign bank account to avoid the imposition of Russian taxes. Complaint ¶ 32.

8. To support this claim, Plaintiffs contend that the Russian SEC turned down qualified applications to operate mutual funds and specialized depositories in Russia from Credit Suisse First Boston and Pioneer Group, Inc. as a part of the conspiracy because they were waiting for Shleifer and Hay to secure the first licenses for themselves. Complaint ¶ 37.

9. Hay, with approval of Shleifer and Zimmerman, tried to convince Zimmerman's business partner, Thomas F. Steyer ("Steyer"), to buy the specialized depository and first Russian mutual fund. Steyer was part owner with Zimmerman of Farallon Fixed Income Associates Limited Partnership. Complaint ¶ 56. Hebert was actively marketing to American investors ownership interest in the Russian mutual fund and specialized depository. Complaint ¶ 56.

ry that Forum was to create, and Forum believed it would retain substantial ownership of the depository. Hebert's description, however, of the "management team" included Hebert as Chief Executive Officer and Zagachin as Chief Operating Officer. Complaint ¶ 57. Hebert predicted large profits as a result of the management team's position of trust with the Russian SEC and the hiring of ILBE as a consultant. *Id.* Also in May 1996, Hebert and Shleifer formed Pallada Asset Management ("Pallada"), with funds from USAID and Zimmerman, for the purpose of obtaining the first mutual fund license.[10] Complaint ¶¶ 59, 60. Hay, Hebert and Sokin also used United States funds to travel to Russia's industrial heartland to generate investment interest in Pallada.[11]

Russian SEC regulations required Keffer and Forum to deposit Four Hundred Thousand Dollars ($400,000) in a cash custody account in Russia as a prerequisite for capitalizing the FRSD. Complaint ¶ 65. In reliance on Hay's representations of the profitability of Forum's continued ownership interest, on July 5, 1996, Keffer and Forum deposited that amount into a cash custody account at Citibank's Moscow branch. Complaint ¶ 66. On July 25, 1996, Forum Consulting and the Russian SEC executed the final Consulting Contract. Complaint ¶ 67. On August 1, 1996, the Russian SEC granted the FRSD the first license to operate a specialized depository. Complaint ¶ 68. On August 8, 1996, Pallada received the first Russian mutual fund license from the Russian SEC, describing the FRSD as its specialized depository. Complaint ¶ 70. Shleifer and Hay could not sell shares of Pallada to

investors until the FRSD commenced its fund administration, so Hay requested that Keffer and Forum commence fund administration services to Pallada. *Id.* Plaintiffs refused to do so until the drafting and revising of the necessary Russian government regulations was completed and Pallada had a prospectus that disclosed its operating procedures. *Id.* Around August 19, 1996, Hay informed Keffer that Forum Consulting would not be paid under the Consulting Contract unless: (1) Zagachin owned fifty-one percent of the FRSD, (2) Zagachin had management control of the FRSD, and (3) the FRSD began administering Pallada's mutual fund by September 2, 1996. Complaint ¶ 71. Keffer told Hay that these demands were unacceptable and warned that the critical legal and institutional infrastructures had not been completed, and that Hay's insistence that the FRSD administer live operations for Pallada's mutual fund on September 2, 1996, would be commercially premature and damaging to the long-term development of a stable mutual fund industry. Complaint ¶¶ 76.

In order to resolve the alleged dispute, Plaintiffs contend that Hay proposed a meeting with Keffer and Forum where Butler would act as a "neutral mediator." Complaint ¶ 72. Plaintiffs allege that Hay intentionally failed to disclose Hay's and Harvard's relationship to Butler or the fact that the Russia Program was the subject of an ongoing federal investigation. Complaint ¶ 72. On August 19, 1996, Keffer, Forum staff members, Hebert, and Hay met with Butler, where Keffer disclosed to Butler that "Hay's conduct was preventing Forum Consulting from completing the

---

**10.** Hebert and Pallada were provided with the services of Harvard employees, office equipment, and office space—all financed with USAID funds. Complaint ¶ 60.

**11.** Plaintiffs make severa references in the Complaint to the sources of funding. It is impossible to determine at this time whether the source of funds may be significant or relevant.

necessary recommendations for revisions to the Russian SEC regulations and [that] Forum Consulting was not being paid for its work." Complaint ¶ 73. Plaintiffs also informed Butler that Hay insisted Zagachin have ownership and management control and that Zagachin was not qualified to manage the FRSD. *Id.* Keffer and his staff also "informed Butler of Hay's insistence that the FRSD administer Pallada's mutual fund when the Russian SEC regulations had not been revised and Pallada did not have an adequate prospectus." *Id.* On August 19, 1996, unknown to Forum and Keffer, Shleifer and Zimmerman had a private meeting with Zagachin, Hebert, and Hay.[12] *Id.*

On August 20, 1996, Butler proposed a change in Forum's role, including that Keffer sell both Forum Consulting and Forum Russia (owner of the FRSD) to Zagachin for $400,000. Complaint ¶ 74. Butler's proposal also provided that: (1) Zagachin would continue to perform the obligations set forth in the Consulting Contract, under Forum Consulting's name; (2) Zagachin would be paid by the World Bank; and (3) Forum would be "precisely defined" as a "subcontractor" and "would process for the first fund to go live on September 2, 1996." Complaint ¶ 74. Over the course of the next several days, Keffer and Vasiliev argued over specific terms of the Consulting Contract, including timelines and creation of the legal and institutional framework

prerequisites necessary to protect Russian investors. Complaint ¶ 78. Keffer had followed Hay's guidance in prioritizing work under the Contract,[13] and was now receiving conflicting demands from Vasiliev. *Id.* At this time, Plaintiffs continued to rely on statements by Vasiliev, who "promised to work with Forum on its problems with the Consulting Contract once ownership of the FRSD was 'stabilized.'" *Id.*

Only after Vasiliev requested that Keffer provide the Russian SEC with a proposal for altering the ownership of the FRSD did Hay's influence over Vasiliev finally become clear to the Plaintiffs. Complaint ¶¶ 78, 79. Plaintiffs then believed that "the representations that Hay had made to them about the ownership and control of the FRSD and receiving payment under the Consulting Contract [had been] false." Complaint ¶ 79. On August 27, 1996, Vasiliev repeated Hay's demand that Keffer and Forum have the specialized depository working on an aggressive timeline, and he requested that Keffer provide the Russian SEC with a proposal for altering the ownership of the FRSD. Complaint ¶ 78. Plaintiffs concluded at this time "that they had no choice but to stem their mounting financial losses by selling Forum Russia" in its entirety. Complaint ¶ 79. According to Plaintiffs' allegations, Shleifer and Hay had

12. It is alleged that, on August 20, 1996, before Plaintiffs had agreed to sell the FRSD, Hay attempted to misappropriate Keffer and Forum's capital investment by instructing Zagachin to transfer the funds in Plaintiffs' Citibank account. Complaint ¶ 75. Under Hay's direction, Zagachin went to Citibank and instructed Citibank employees to transfer the $400,000 from the cash custody account into the operating account of the FRSD. Citibank notified Forum of this attempt, and Forum instructed Citibank that Zagachin did not have the authority to transfer the funds, and

Citibank consequently refused to conduct the transaction. Complaint ¶ 75.

13. For example, Hay had instructed Forum to delay the work of revising Russian SEC regulations and the mutual fund infrastructure, including the regulatory framework for a mutual fund industry, and to work only on the portions of the Consulting Contract relating to creating the operational procedures necessary to create and license the specialized depository. Complaint ¶ 61.

planned to influence the Russian SEC to withhold payments due Forum under the Consulting Contract so that they could use the resulting financial pressure on Forum as leverage to force Forum to relinquish ownership and control of the specialized depository to them and their co-conspirators after Forum had obtained the license.

Complaint ¶ 55. Plaintiffs allege that, due to the financial pressures placed on them and the threats of Hay that he would see to it that the Russian SEC would not perform the Consulting Contract, they reluctantly agreed to sell Forum Russia, including Forum Russia's ownership of the FRSD and the $400,000 in the Citibank capital account, to Zagachin. Complaint ¶¶ 79, 80.

On September 3, 1996 Oasis Financial Services, LLC ("Oasis") purchased Forum Russia, including the FRSD, from Keffer and Forum Financial for $408,000. Complaint ¶ 80. Hay provided financing to Oasis to assist with the completion of this transaction.[14] *Id.* Zagachin was the record owner of 99% of Oasis and of Sage Capital, which owned the remaining 1% of Oasis. *Id.*

Plaintiffs allege that Defendants were motivated by ill will, were outrageous, and acted with malice. Complaint ¶ 151. To support this contention, Plaintiffs maintain that Harvard failed to establish a competent system to administer, audit, oversee, supervise and/or control Shleifer's and Hay's exercise of their duties, responsibilities, authority and influence in Russia. Complaint ¶ 24. Harvard lacked proper oversight over HIID because "Harvard administrators [including Shleifer] were aware of abuses [in HIID programs] and allowed them to continue." Complaint ¶¶ 27, 53. Harvard was aware that ILBE and Harvard employees in Russia "were hired for improper reasons, were unqualified and/or did not show up for work on a regular basis other than to collect their pay." Complaint ¶ 28. Harvard, ILBE, and USAID knew, or had reason to know, of evidence of mismanagement of the Russia Program before the Consulting Contract was executed with Forum. Complaint ¶ 26. Additionally, Plaintiffs allege that Shleifer knew of Hay's activities and gave substantial assistance and encouragement to Hay regarding his dealings with Plaintiffs and the Russia Program. Complaint ¶ 101. Finally, Shleifer acted "in concert with" Hay and "pursuant to a common design with Hay" in the conspiracy to defraud Forum for their own personal financial gain. Complaint ¶ 102.

## B. Final Developments

In January 1997, Forum Consulting executed an Agreement with the Russian SEC ("Release Agreement") for release of certain claims relating to their previously executed Contract, which terminated on October 10, 1996.[15] *See* Hay's Motion to

---

14. Plaintiffs point out in their Supplemental Memorandum of Law in Opposition to Defendants Andrei N. Shleifer's (sic) and Jonathan Hay's Motions to Dismiss, that Hay admitted in his Answer (Hay Answer at ¶¶ 56–59), "that his father made a 'bridge loan' to Hebert, of which $200,000 came from a joint account containing Hay's funds, and that Hebert then made a $400,000 loan to Zagachin—which funds were used to purchase the First Russian Specialized Depository ('FRSD') for Oasis Financial Services, Inc., a holding company standing in Zagachin's name." Docket No. 48.

15. Plaintiffs made no mention of the Release in their Complaint, however, Defendants raised the issue of the Release as an affirmative defense. Defendants attach as Exhibit B to Docket No. 2 two copies of the Release, each signed by only one party, which appear to have been faxed to each other. Neither the pleadings nor the record contains information regarding where geographically the release was signed.

Dismiss with Incorporated Memorandum of Law (Docket No. 30, citing Ex. B). On May 20, 1997, USAID suspended the USAID Contracts based upon findings by its Inspector General of misconduct by Shleifer and Hay in Russia. Complaint ¶ 83. On May 23, 1997, Harvard removed Shleifer and Hay from their positions with Harvard's Russia Program. Complaint ¶ 84. On August 1, 1997, USAID terminated Harvard's USAID Contracts. *Id.* On February 7, 2000, Harvard disbanded HIID. Complaint ¶ 86. On September 26, 2000, the United States filed a civil action in the United States District Court, District of Massachusetts, against Harvard, Shleifer, Hay, Zimmerman, and Hebert, alleging against them, *inter alia,* claims for violations of the False Claims Act, 31 U.S.C. § 3729, and for fraud and civil conspiracy arising out of their activities to launch the first Russian mutual fund management company and the first Russian specialized depository. Complaint ¶ 87.

### C. Defendants' Contacts with Maine

For purposes of these Motions to Dismiss, Plaintiffs have alleged that Defendants or their agents made the following relevant contacts with the State of Maine. In February 1996, Hebert telephoned Keffer in Maine to discuss Forum creating a mutual fund service company in Russia. Complaint ¶ 41. Beginning in March 1996 and continuing through August 1996, Hay made and received a series of phone calls and faxes to and from Keffer in Maine concerning Forum's creation of the FRSD. Complaint ¶ 44, 50, 52; Keffer Decl. ¶ 15. Plaintiffs allege that these communications pertained to negotiating the terms of the alleged representations Hay made to Keffer, namely, that Forum would retain substantial ownership and management control of the specialized depository entity they were to help create, and that the venture would be profitable to Forum.

Complaint ¶¶ 49, 52. Hebert telephoned Keffer in Maine to advise that she and Zagachin were considering Forum as their fund administrator in Russia. Complaint ¶ 41.

In February 1996, Hebert sent three facsimiles to Keffer in Maine regarding her and Zagachin's plans for mutual fund administration. Complaint ¶¶ 42, 43. Specifically, Plaintiffs allege that Hay drafted and faxed to Forum in Maine a letter dated March 5, 1996, from Dimitri Vasiliev, Chairman of the Russian SEC, encouraging Forum to establish "a company in Russia that would supply fund administrative services to the large number of mutual funds that are being launched in Russia." Complaint ¶ 44. When Keffer met Hay in Russia on March 18, 1996, Hay identified himself as working for Harvard, explained that he was using USAID grant money to assist the Russian government on the capital market project, and gave Keffer his Harvard business card, which clearly identified his Harvard affiliation. Complaint ¶ 47. Hay sent Keffer a facsimile on March 22, 1996, in Maine, providing his e-mail and mailing addresses in Russia, in care of HIID. Complaint ¶ 50. On April 12, 1996, Shleifer and Hay caused Vasiliev to fax to Forum in Maine a request to submit another proposal for the Specialized Depository Project. Complaint ¶ 52. At Hay's request, another Harvard employee sent a fax to Forum on May 16, 1996, regarding arrangements for an upcoming visit by Forum to Moscow. Keffer Decl. ¶ 4.

■ From April 5–15, 1996, while Zagachin was an employee of HIID, Zagachin visited Forum in Maine and met with Keffer to conduct due diligence on Forum for Hay, i.e. to meet with Keffer and observe Forum's operations in order to assist Hay in determining whether Forum was capable of creating the specialized depository

in Russia. Complaint ¶ 51. Zagachin's expenses for this trip were submitted to, and approved by, Hay.[16] *See* Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants Shleifer's and Hay's Motions to Dismiss (Docket No. 48); Ex. 7A, 7C (Docket No. 49); *see also* Reply Memorandum to Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants Shleifer's and Hay's Motions to Dismiss With Incorporated Memorandum of Law (Docket No. 51). On May 20, 1996, and on other occasions. Hay sent electronic mail to Dana A. Lukens, Esq., a Forum employee in Maine, concerning creation of a specialized depository. Lukens Decl. at ¶ 4. On May 13, 1996, the Russian SEC mailed to Forum in Maine written notification, on Russian SEC stationery signed by a Harvard employee, that Forum's proposal had been selected by the Russian SEC. Complaint ¶ 54. In August 1996, Zagachin traveled to Forum's Maine office for a second time to review Forum's operations for Hay;

and her expenses for this trip were again submitted to, and approved by, Hay.[17] Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants Shleifer's and Hay's Motions to Dismiss (Docket No. 48), Ex. 7A, 7C (Docket No. 49). Zagachin made twelve telephone calls to Forum in Maine in August 1996 as part of her effort to review Forum's operations for Hay. *Id.* On September 3, 1996, Oasis Financial Services wired $400,000 to Forum in Maine for purchase of the specialized depository created by Forum and Keffer. Ex. 7D (Docket No. 49).

## III. DISCUSSION

### A. The Choice of Law Question

■■■ A preliminary question for this Court is whether the law of Maine or the law of Massachusetts should be applied in this diversity action.[18] A federal court that "exercises diversity jurisdiction over state-law claims must apply the choice-of-

---

**16.** The First Circuit Court of Appeals has held that when "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)" *Beddall v. State Street Bank and Trust Company,* 137 F.3d 12, 17 (1st Cir.1998) (citing, *inter alia,* 2 James Wm. Moore Et Al., *Moore's Federal Practice* § 12.34[2] (3d ed.1997) (explaining that courts may consider '[u]ndisputed documents alleged or referenced in the complaint' in deciding a motion to dismiss); *see generally* Fed.R.Civ.P. 10(c) (stating that '[a] copy of any written instrument which is an exhibit to a pleading is a part thereof'). *Id.* The Court also notes that Defendants do not dispute the legitimacy of the documents contained in the exhibits offered in Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants Shleifer's and Hay's Motions to Dismiss, rather Defendants contest the imputed meaning or inferences to be drawn from the documents, material questions of fact which

are not before the Court on a Motion to Dismiss. Notwithstanding that much record evidence "is out-of-bounds in reviewing a 12(b)(6) dismissal, it is well-established that in reviewing the complaint, we 'may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.' " *Clorox Company Puerto Rico v. Proctor & Gamble Commercial Company,* 228 F.3d 24, 32 (1st Cir. 2000) (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)).

**17.** The Court notes, again, that the source of funds used to pay Zagachin's expenses is not in the record or pleadings before the Court.

**18.** Plaintiffs and Defendants have cited to Maine law in their pleadings, and neither party has argued that Massachusetts law should apply. No contention is made that substantive Russian law, as opposed to Maine substantive law, should be applied in resolving the subject motions.

law rules of the state in which it sits." *Burr v. Melville Corporation,* 868 F.Supp. 359, 363 (D.Me.1994) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). This Court looks to the Restatement (Second) of Conflicts which

> directs courts to consider which state has the most significant relationship to the occurrence and parties considering the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.

*Burr,* 868 F.Supp. at 363 (citing Restatement (Second) Of Conflicts § 145); *see also Adams v. Buffalo Forge Company,* 443 A.2d 932, 934–45 (Me.1982).

Any injury caused by Defendants occurred in Maine or in Russia, but not in Massachusetts. Plaintiffs never traveled to Massachusetts, and Defendants' residence or domicile in Massachusetts is not determinative because Plaintiffs reside in Maine. Plaintiffs alleged that the relevant misrepresentations took place, initially, in Maine and, subsequently, in Russia. Defendants' agents traveled to Maine to initiate the business dealings with Plaintiffs, and the rest of the actions giving rise to the claims took place either in Maine or outside the United States—in Russia and at Plaintiffs' offices in Poland. Massachusetts certainly has no stronger connection to or greater interest in this case than does Maine.[19] The application of Maine law in these circumstances serves to pro-

tect the "more significant relationship . . . to the occurrence and the parties." *Mahon v. East Moline Metal Products,* 579 A.2d 255, 256–57 (Me.1990)(citing *Adams,* 443 A.2d at 934). Because Maine has the most significant relationship to the occurrence and to the parties, the Court will apply Maine law to Plaintiffs' claims.

## B. The Motion to Dismiss

■ In deciding a motion to dismiss, the Court assumes that all of the factual allegations in the complaint are true, and it draws all inferences in favor of the Plaintiffs. *Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48 (1st Cir.1993). A "complaint should not be dismissed unless it appears beyond doubt that Plaintiffs can prove no set of facts that would entitle them to relief." *See Federal Deposit Insurance Corporation v. S. Prawer & Co.,* 829 F.Supp. 453, 455(D.Me.1993) (citations omitted). Defendants have moved jointly for dismissal on several grounds, and Defendants have also raised several personal affirmative defenses. The Court will address each argument in turn.

### 1. Lack of Personal Jurisdiction under Fed.R.Civ.P. 12(b)(2) Over Defendants

■ In a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is proper. *See Rodriguez v. Fullerton Tires Corp.,* 115 F.3d 81, 83 (1st Cir.1998) (citing *Sawtelle v. Farrell,* 70 F.3d 1381, 1387 (1st Cir.1995); *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir.1995)). The plaintiff must make a *prima facie* showing of personal jurisdiction by citing to specific evidence in

---

**19.** Moreover, Defendants would not be helped by the application of Massachusetts agency law, for example, where a principle may be held accountable in tort for unauthorized acts of an agent not too far removed from the scope of his authority even though, strictly, they were not authorized. *See Doody v. John Sexton & Company,* 411 F.2d 1119 (1st Cir. 1969).

the record. *See, Boit v. Gar–Tec Products*, 967 F.2d 671, 675 (1st Cir.1992). A Plaintiff must satisfy two cornerstone conditions: "first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." *Foster–Miller, Inc.*, 46 F.3d at 144 (citations omitted). In a case arising under diversity jurisdiction, a federal court's personal jurisdiction is equivalent to that of the forum's state court. *See Sawtelle*, 70 F.3d at 1387. Thus, in this case, Maine's long-arm statute defines the limits of the Court's personal jurisdiction. *See* 14 M.R.S.A. § 704–A. Because the Law Court has determined that the limits of Maine's long-arm statute are coextensive with the limits of the Due Process Clause of the Fourteenth Amendment, the Due Process Clause actually determines the limits of the Court's jurisdictional reach in this diversity case. *See Electronic Media Int'l v. Pioneer Communications of America, Inc.*, 586 A.2d 1256, 1258 (Me. 1991) (*citing Harriman v. Demoulas Supermarkets, Inc.*, 518 A.2d 1035, 1036 (Me. 1986)). The first condition is met because Maine law authorizes long-arm jurisdiction over out-of-state defendants by statute. *See* 14 M.R.S.A. § 704–A.

The second of the cornerstone conditions "implicates three distinct components, namely, relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness." *Foster–Miller, Inc.*, 46 F.3d at 144. The Court will construe the allegations in the record in the light most favorable to the nonmoving party, herein Plaintiffs. *See Coolidge v. Judith Gap Lumber Co.*, 808 F.Supp. 889, 891 (D.Me.

1992). Additionally, the Court considers any uncontradicted facts put forward by Defendant. *See Boit*, 967 F.2d at 675. Once the Court determines that Plaintiffs have made a *prima facie* showing of Maine's legitimate interest in the controversy and the requisite minimum contacts, the burden shifts to the Defendants, who, in order to defeat Plaintiffs' claim of jurisdiction, must show that the Court's exercise of jurisdiction would not comport with "traditional notions of fair play and substantial justice." *Coolidge*, 808 F.Supp. at 891.

■ If a defendant's activities within the forum state are "continuous and systematic," the defendant has a sufficient relationship with the forum state to support a finding of general jurisdiction. *Helicopteros Nacionales de Colombia, S.A., v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Plaintiffs assert that Defendant Harvard is subject to general personal jurisdiction within the state of Maine on the grounds that Harvard carries on continuous and systematic activities within the state of Maine including, *inter alia*, ownership of real estate in Maine, sending employees to recruit students in Maine, and the derivation of substantial revenues from tuition paid by Maine residents. *See* 13–A M.R.S.A. § 1213. Although Harvard originally raised the defense of lack of personal jurisdiction, Harvard does not now contest that it is subject to personal jurisdiction in Maine,[20] and has thereby waived this defense. *See* 13 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3522, at 78 (1984)("Jurisdiction over the person is a waivable defect.");

---

**20.** Defendant Harvard references a prior Statement of Defendant President and Fellows of Harvard College Regarding Personal Jurisdiction, made on February 15, 2001, in which Harvard waived its right to contest personal jurisdiction. *See* Defendant President and Fellows of Harvard College's Renewed Motion to Dismiss (Docket No. 47).

see also, 14 M.R.S.A. § 704–A. Accordingly, the Court has personal jurisdiction over Defendant Harvard in Maine.

Plaintiffs assert that the Court has specific personal jurisdiction over Defendants Shleifer and Hay on the grounds that they, in person or through their agents, did or caused a tortious act to be done, or caused the consequences of the tortious act to occur, within the state of Maine.[21] See 14–A M.R.S.A. § 704–A. If a court cannot assert general jurisdiction over a defendant, it may, nevertheless, still assert specific jurisdiction. See United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp., 960 F.2d 1080, 1088 (1st Cir.1992). The First Circuit has formulated a tripartite test for the ascertainment of specific jurisdiction. Id., 960 F.2d at 1089. Thus, "[s]pecific personal jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Id., 960 F.2d at 1088–89 (citations omitted). The "defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Id., 960 F.2d at 1089. Finally, the exercise of jurisdiction must also be reasonable in light of certain "Gestalt factors." Id.

### a. Relatedness

Plaintiffs contend that their claims relate to Maine. The First Circuit has distinguished the relatedness inquiries essential for contract claims as opposed to tort claims. See Massachusetts School of Law at Andover, Inc. v. American Bar Association, 142 F.3d 26, 35 (1st Cir.1998). For a contract claim, the Court looks to "whether the defendant's forum-based activities are 'instrumental in the formation of the contract,'" id. (citing Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983)); whereas, for a tort claim, the court examines whether the plaintiff has established both "'cause in fact (i.e. that the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e. the defendant's in-state conduct gave birth to the cause of action).'" Id. (citing United Elec., Radio & Mach. Workers, 960 F.2d at 1089). Plaintiffs' claims in this case sound in tort. Thus, the Court will look to see whether Plaintiffs have established cause in fact as well as legal cause. Plaintiffs have alleged that the relevant contacts between Shleifer and Hay with Maine stem from Harvard/HIID's business dealings with Forum Consulting, including actions taken by agents[22] of the named Defendants. Spe-

21. Since Plaintiffs do not assert general jurisdiction over Shleifer and Hay, the Court will not address that basis for personal jurisdiction.

22. Specifically, Plaintiffs have alleged that Elizabeth Hebert, Julia Zagachin, and Nancy Zimmerman were agents of Hay, Shleifer, and Harvard, and that Shleifer and Hay were agents of Harvard. The Law Court has held that in order to establish a claim against a corporate entity based on vicarious liability, a plaintiff must show that the actor was an employee, and the vital factor in determining that relationship is "'whether or not the em-

ployer has the power of control or superintendence over' the other person." See Legassie v. Bangor Publishing Company, 741 A.2d 442, 444 (Me.1999)(citing Timberlake v. Frigon & Frigon, 438 A.2d 1294, 1296 (Me.1982)). Maine agency law similarly focuses on control: "Agency is the fiduciary relationship 'which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Perry v. H.O. Perry & Son Co., 711 A.2d 1303, 1305 (Me.1998) (citing Desfosses v. Notis, 333 A.2d 83, 86 (Me.1975)). For purposes of these Motions to Dismiss, the Court finds that

cifically, Plaintiffs have alleged that representations made to them in Maine adversely affected and interfered with their prospective economic advantage in Forum's Contract with the Russian SEC, and that the Maine injury was a foreseeable consequence of Defendants' alleged tortious conduct. Plaintiffs have alleged that a conspiracy existed from the inception of the plan to involve Forum Consulting in the USAID project. The first contacts with Keffer and Forum Financial in Maine, Plaintiffs contend, gave birth to the injury because Defendants were planning to defraud Plaintiffs and, in fact, needed Plaintiffs in order to accomplish their scheme.

But for Defendants' original contacts with and solicitation of Plaintiffs' participation in the Russia Program, including Defendants' alleged misrepresentations about Plaintiffs' prospects for profits in helping to set up a mutual fund industry in Russia, as alleged, Plaintiffs would not have been harmed. Plaintiffs have alleged a tortious conspiracy relating to and arising from the very first conversations and meetings held by agents of Harvard, Shleifer, and Hay with Forum Financial in Maine. Since Plaintiffs allege that a conspiracy or fraudulent intent existed from the very beginning relating to the initial contacts with Defendants in Maine, they have sufficiently alleged both cause-in-fact and legal cause for the tort claims in Maine.

### b. Minimum Contacts

Minimum contacts are particularly important to a jurisdictional analysis of tort claims: "In contradistinction to contractual cases, specific jurisdiction in tort cases depends largely on the strength of the connection between the tortious conduct and the contact with the forum, rather than the purposeful availment of benefits in the forum." *Barreras Ruiz v. The American Tobacco Company*, 964 F.Supp. 613, 614 (D.P.R.1997) (citing *Thompson Trading v. Allied Lyons PLC*, 123 F.R.D. 417, 426 (D.R.I.1989)). "[E]ven a single intended act may be sufficient to oblige a foreign corporation to submit to jurisdiction" in the forum state. *Barreras Ruiz*, 964 F.Supp. at 614 (citing *International Shoe v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945)). By knowingly initiating contact with and shipping a product into Maine, this Court has previously held that, a defendant "could have anticipated invoking the benefits of Maine law." *Coolidge*, 808 F.Supp. at 891. Similarly, this Court has previously found that a manufacturer's awareness that its distributors' sales territories included Maine as a target market was "the sort of conduct that 'may indicate an *intent or purpose* to serve the market in the forum State.'" *Unicomp, Inc. v. Harcros Pigments, Inc.*, 994 F.Supp. 24, 27 (D.Me. 1998) (quoting *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)) (emphasis added in *Unicomp*).

▆ In the present case, Plaintiffs have alleged, "that Defendants traveled to Maine in connection with" the business transactions at issue. In addition to numerous mail, facsimile, and telephone communications directed by Defendants to the state of Maine, it is uncontested that Hebert and Zagachin, who are alleged to be co-conspirators in the tortious activities, traveled to Maine at the direction of Hay to solicit the contract with Forum Fi-

Plaintiffs have sufficiently alleged such a relationship among the parties, based on Maine

agency law and vicarious liability principles.

nancial. Additionally, Plaintiffs allege that money was wired to Forum in Maine. Although mere awareness that one's product (or financial payment) will end up in the forum state is not enough to foresee being subject to jurisdiction there, nevertheless, targeting and initiating an ongoing business relationship with a Maine company evinces an intent to avail oneself of the benefits of the forum state, including participation in the market and access to its courts. *See Unicomp*, 994 F.Supp. at 26 (citing *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1026). Defendants in this case allegedly purposefully sought out Forum, in Maine, because of its' expertise, and they traveled to Maine and initiated contacts with Forum in Maine in order to create the business relationship, which became the subject of the Consulting Contract. *Cf. Telford Aviation, Inc. v. Raycom National, Inc.*, 122 F.Supp.2d 44, 47 (D.Me.2000) (holding that phone, fax, and mail communications alone were insufficient to constitute purposeful availment). Such a course of conduct shows that Defendants focused their business efforts on entities and persons in the State of Maine. That is sufficient "additional conduct," under *Asahi*, to establish "purposeful availment" of the benefits of doing business in the Maine forum because it shows a specific intent on the part of Defendants to do so. *See Unicomp*, 994 F.Supp. at 26 (citing *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1026). The contacts with Maine are suffi-

ciently related to the transaction giving rise to the alleged torts to establish that Defendants purposefully availed themselves of the jurisdiction of Maine.[23] The Court finds Defendants Shleifer and Hay subjected themselves to personal jurisdiction in Maine by, *inter alia*, directing the actions of their alleged agents in Maine.

### c. Reasonableness

 The Court also looks to the "Gestalt factors" in order to determine whether the exercise of jurisdiction is reasonable under the given circumstances, *i.e.* whether it comports with "fair play and substantial justice." These factors include: "the plaintiff's interest in obtaining convenient and effective relief; the burden imposed upon the defendant by requiring it to appear; the forum's adjudicatory interest; the interstate judicial system's interest in the place of adjudication; and the common interest of all affected sovereigns, state and federal, in promoting substantive social policies." *Donatelli v. National Hockey League*, 893 F.2d 459, 465 (1st Cir.1990) (citations omitted). Defendants have the burden to demonstrate that jurisdiction would not be reasonable. *See Coolidge*, 808 F.Supp. at 891.

In this case, the balancing of the Gestalt factors weighs in favor of the Court exercising personal jurisdiction over Defendants Shleifer and Hay. As Maine resi-

---

**23.** Although Plaintiffs' claims are not grounded in contract, another First Circuit case involving a contract nevertheless lends additional support to the Court exercising personal jurisdiction over Defendants. In *Pritzker v. Yari*, 42 F.3d 53, 62 (1st Cir.1994), the Court found jurisdiction in part because the nonresident defendant, by contract had "knowingly acquir[ed] an economically beneficial interest" in forum-based litigation involving forum-based real estate. Although the defendants were not a party to Plaintiffs' Contract with the Russian SEC, Defendants

nevertheless sought to profit (albeit indirectly) from relationships and transactions surrounding and resulting from that Contract. Despite the fact that Harvard's own conflict of interest policies, as well as USAID policies, strictly prohibited Defendants from obtaining any personal, financial or commercial interest in their dealings with Forum on the Russia Project, Plaintiffs allege that Defendants nevertheless intended to, and attempted to, personally profit from their involvement with Forum's Consulting Contract with the Russian SEC.

dents, Plaintiffs have a strong interest in litigating the case in Maine. Defendants, although residing outside the state, are both United States citizens, and are not far away,[24] and would not be unfairly burdened by being required to litigate in this Court as opposed to the District Court in Massachusetts. Litigating this case in Maine would not be burdensome to Defendant Shleifer. Although Hay currently lives in Russia, he formerly lived and worked in Massachusetts, and he is still a United States citizen who maintains ties there. According to the record, it appears that Defendant Hay has voluntarily consented to personal jurisdiction in Massachusetts and, indeed, has been appearing in the United States District Court for the District of Massachusetts as a Defendant against the United States. *See United States v. President and Fellows of Harvard College,* Civ. No. 00–11977DPW (D. Mass., filed Sept. 26, 2000). Hay cannot claim that jurisdiction in Maine—two hours away—is unreasonable. No other forum has a greater interest in having the case decided in its jurisdiction.[25] Finally, Plaintiffs have further alleged that the Defendants sought out, by activities directed into the state of Maine, Plaintiff Forum, a Maine company, for its expertise in international monetary policy development and capital market abilities, and they might be expected to face litigation in the state of Maine, regardless of the fact that the subject matter of the contract and the bulk of activities were performed outside of the United States, *e.g.,* in Russia. Consideration of the above factors leads the Court to conclude that the exercise of specific personal jurisdiction over Defendants Shleifer and Hay is reasonable and appropriate in this case.

## 2. Personal Service on Hay

■ Defendant Hay reasserts the defense of lack of service of process by claiming that personal service on his attorney was not "good and sufficient." Due process concerns require that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United States v. Giraldo,* 45 F.3d 509, 511 (1st Cir.1995) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). In order to provide personal service on Hay, Chief Judge Hornby directed that service of process be made on attorney Lawrence Spiegel, Esq. of Skadden Arps Slate Meagher & Flom, LLP in New York pursuant to Fed.R.Civ.P. 4(f)(3). *See* Order (Docket No. 22). Plaintiffs served, pursuant to that Order, a Summons and copy of the Complaint on Attorney Spiegel via certified mail, and the Return of Service was filed with this Court. Judge Hornby concluded "that service of process via Spiegel is appropriate given Hay's efforts to evade service in Russia and Spiegel's recent acceptance of service on Hay's behalf in a case also involving Hay's business dealings in Russia." *Id.* Attorney Speigel never argued that Hay failed to have notice, or that Speigel was not in contact with Hay. In fact, Defendant Hay obtained local counsel in Portland, Maine and filed a Motion to Dismiss. It appears that the court-directed service to

---

**24.** For a more detailed discussion see *infra* section on Transfer. *See, e.g., Ashmore,* 925 F.Supp. 36 (holding that transfer from Portland, Maine to Boston, Massachusetts was unnecessary based on the alleged inconvenience to Defendants residing in Massachusetts, *i.e.,* a two-hour car ride away from the

forum was not inconvenient enough to warrant transfer).

**25.** For a more detailed discussion of the Massachusetts' interest in this litigation *see infra* Section on Transfer.

Hay's attorney, Speigel, was reasonably calculated to, and did, in fact, accomplish such notice to Defendant Hay. The service of process on Hay comports with due process, and is, therefore, "good and sufficient." *United States v. One Urban Lot*, 885 F.2d 994, 998–99 (1st Cir.1989) (quoting *Mullane*, 339 U.S. at 314, 70 S.Ct. 652).

### 3. Transfer

Defendants have moved for Transfer to the United States District Court for the District of Massachusetts because of improper venue, pursuant to 28 U.S.C. §§ 1406, 1631, and 1404. Pursuant to 28 U.S.C. § 1406, a District Court may transfer a case to another District Court if venue is improper in the forum state or the Court lacks personal jurisdiction; under 28 U.S.C. § 1631, transfer is appropriate to cure want of jurisdiction; and 28 U.S.C. § 1404 simply permits a change of venue "in the interest of justice" to any other district where it might have been brought. Venue is proper in a judicial district (1) where any Defendant resides, (2) in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) in which any Defendant is subject to personal jurisdiction. *See* 28 U.S.C. § 1391(a). If a Defendant is a corporation, venue is proper where there is personal jurisdiction. *See* 28 U.S.C. § 1391(c). Because the District of Maine has personal jurisdiction over Defendants and a substantial part of the events giving rise to the claims occurred in Maine, venue is proper in Maine, and transfer to Massachusetts is unnecessary under 28 U.S.C. § 1406. Similarly, because the Court has jurisdiction over Defendants, 28 U.S.C. § 1631 is inapplicable here. *See Pedzewick v. Foe*, 963 F.Supp. 48 (D.Mass.1997).

According to 28 U.S.C. § 1404(a), Plaintiff's choice of forum is entitled to great weight. *See Ashmore*, 925 F.Supp. at 39 (holding that the "First Circuit's clear directive [is] that [Plaintiff's] choice [of forum] should be given 'substantial deference' whether or not Plaintiffs reside in the forum" (citations omitted)). Defendants bear a substantial burden of demonstrating why there should be a change of forum, "[t]he evidence presented by Defendant must weigh heavily in favor of transfer before this Court will disturb Plaintiff's choice of this forum—especially since this forum is Plaintiff's home forum." *Demont & Associates v. Berry*, 77 F.Supp.2d 171, 173 (D.Me.1999) (citing, *inter alia, Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981)). While it appears that venue may also be proper in the District of Massachusetts, where the United States District Court would also have personal jurisdiction over the Defendants, Defendants have not met their burden of establishing that transfer is warranted. Defendants' main argument in support of transfer appears to be for their own convenience. This Court has held that the inconvenience "presumably due to the business costs of litigating in a venue a few hours away by car," when balanced with the "relative financial strength of the parties to absorb the costs of litigation," and "amorphous allegations of inconvenience regarding unspecified documents, as with unnamed witnesses, are inadequate to satisfy the required clear showing of balancing of conveniences in favor of [Defendant]." *Ashmore*, 925 F.Supp. at 39. Further, in *Ashmore*, this Court found that considerations "in the interest of justice" weighed in favor of denying the transfer of venue out of Maine because the parties could receive an earlier resolution of the matter in Maine than would likely be afforded because of a heavier Massachusetts docket, which would likely result in "slower adjudication of the merits of the case." *Ashmore*, 925 F.Supp., at

39–40.[26] Additionally, Defendants have failed to show any significant burden imposed by a trial in Maine as opposed to Massachusetts (where only two of the Defendants reside) or Russia (where some of the events occurred and only one Defendant resides). *See Mahon*, 579 A.2d at 256–57. The convenience of Defendants when juxtaposed against the interests of justice is simply insufficient to warrant transfer.

Defendants have further argued that this Court should exercise its discretion in granting their motion for Transfer. Defendants rely on *Bayside Enterprises, Inc. v. Mattern's Hatchery, Inc.*, 741 F.Supp. 21, 22 (D.Me.1990), for support of their Motion for Transfer. In *Bayside*, the Court found that two similar cases proceeding in two different federal courts entailed duplicative litigation and granted Defendant's Motion to Transfer. *Bayside*, 741 F.Supp. at 22. This Court's holding in *Bayside* is distinguishable since there was not just an overlap of issues with the same Defendants, as in this case, but the parties, both Plaintiff and Defendants, were identical. The Court considered the order in which jurisdiction was obtained by the two courts, the availability of documents, and the possibilities of consolidation, and noted a general preference in a choice-of-venue decision for the first filed action. *Id.* Plaintiffs have argued that this case is not to be appropriately consolidated with the case brought by the United States against these Defendants in the District of Massachusetts because Plaintiffs are not parties to that case and Plaintiffs' claims represent only a small part of the factual issues presented in the pending Massachusetts case. Consolidating Plaintiffs' case, they argue, would therefore risk it becoming subservient to the more extensive and complex factual issues presented in the federal lawsuit and would expose Plaintiffs to unnecessary and undue expense and delay. Weighing the factors noted above, the Court finds that this suit does not warrant a discretionary transfer under 28 U.S.C. § 1404(a). Accordingly, the Motion for Transfer will be denied.

### 4. Forum *Non Conveniens*

 Defendants contend that the United States Court for the District of Maine should decline to hear this case because the doctrine of forum *non conveniens* provides that Russia would be a more appropriate forum for the disposition of the matters at issue herein. "The doctrine of *forum non conveniens* permits a trial court, on a discretionary basis, to dismiss a case where an alternative forum is available in another country that is fair to the parties and substantially more convenient for them or the courts." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 719 (1st Cir.1996)(citing *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 947 (1st Cir. 1991), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418.) Because "there is a strong presumption in favor of a plaintiff's forum choice, the defendant must bear the burden of proving both the availability of an adequate alternative forum and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum." *Id.* "*Forum non conveniens* is a flexible, practical doctrine designed to avoid trials in places so 'inconvenient' that transfer is needed to avoid serious unfairness," and plaintiff's choice of forum is to be disturbed only "rarely." *Id.* (citing *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 945 (1st Cir.1991); *Piper Air-*

---

**26.** Administrative Office of the United States Courts, 2000 Federal Court Management Sta- tistics at 37 & 38 (2001).

*craft Co. v. Reyno,* 454 U.S. 235, 259, 102 S.Ct. 252, 267, 70 L.Ed.2d 419 (1981); *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)). Assuming an adequate alternative forum exists in which the case may be heard, "the Court then must balance a series of private and public interests in determining whether to retain the case or dismiss it in favor of [the] alternative forum." *Manela v. Garantia Banking Ltd.,* 940 F.Supp. 584, 590 (S.D.N.Y.1996) (quoting citations omitted). Private interest factors include the "relative ease of access to sources of proof, availability of compulsory process, comparative trial costs, ability to enforce a judgment, 'and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Nowak,* 94 F.3d at 719 (quoting *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843). Public interest factors include "the practical difficulties of unnecessarily imposing upon a busy court the obligation to hear a case more fairly adjudicated elsewhere, the imposition on jurors called to hear a case that has no relation to their community, and the familiarity of the court with applicable laws." *Id.* at 719–20. Defendants claim that this case is at root a predominantly Russian affair, "Russian courts can decide cases arising out of economic torts" and that the alternative forum need not be equivalent to the chosen forum to be adequate. Docket No. 44 at 4. Plaintiffs respond arguing that Defendants have failed to establish that Russia would provide an adequate alternative forum for this litigation. Specifically, Plaintiffs assert that all parties are United States citizens, there is no basis for the Court to conclude that either Harvard or Shleifer would be amenable to process in Russia or would consent to suit there, and finally, although involving some transactions and property losses in Russia, is essentially local to the Maine Plaintiffs. Defendants also argue that issues of Russian law make adjudication in Russia more appropriate. Plaintiffs deny that a United States Court will have to pass on any Russian laws in order to resolve the controversy.

The Court finds that Defendants have failed to meet their burden of demonstrating either oppressiveness to them or that plaintiffs have no, or only a slight, interest in the convenience of Maine as the forum for adjudicating their claims. Some of the factors weighing against the application of the doctrine in this case include, *inter alia,* that all parties to this lawsuit are United States citizens, that all Plaintiffs are residents of Maine, that all Defendants but Hay are residents of Massachusetts, and that a significant portion of the alleged tortious activity took place in Maine. Defendants have failed to demonstrate that Russia provides an adequate alternative forum, that Defendants Shleifer and Harvard would be amenable to service of process in Russia or would consent to suit there, or the existence of a specific witness or documents located in Russia, which would necessitate the litigation taking place there. Contrary to Defendants' assertions, it does not appear that the Court will have to interpret or rule on any official Russian laws or decisions and, that, even if that should occur, the interpretation or application of some provisions of Russian law would not be beyond the objective capacity of the Court. The fact that Russian SEC actions may be offered as proof in the case may not require this Court's interpretation of underlying Russian law. For the foregoing reasons, Defendants' motion for forum *non conveniens* transfer is denied.

### 5. Failure to State a Claim Upon Which Relief Can Be Granted

Defendant Hay has moved to dismiss Plaintiffs' Complaint for failure to state claims upon which relief can be granted

pursuant to Fed.R.Civ.P. 12(b)(6). The Court will also address the sufficiency of the claims against Defendants Shleifer and Harvard because each of those Defendants has adopted the Hay's arguments. When evaluating a motion to dismiss under Rule 12(b)(6), the court takes the "well-pleaded facts as they appear in the complaint, extending the plaintiff every reasonable inference in his favor." *Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 187 (1st Cir.1993). The First Circuit has stated, that in order to survive a motion to dismiss, "plaintiffs must set forth 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery.'" *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir.1996) (citations omitted). The Court will address each claim, including each element of the claim, in turn.

### a. Tortious Interference With Prospective Economic Advantage

In order to establish the elements of tortious interference with prospective economic advantage under Maine law, Plaintiffs must show "'the existence of a valid contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference.'" *James v. Mac-Donald*, 712 A.2d 1054, 1057 (Me.1998) (quoting *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me.1995)). In addition to the Contract here, Plaintiffs have set forth allegations of the existence of prospective economic advantage involving their business venture in Russia to create and launch the FRSD and the first mutual funds, and their potential advantage of earning profits over some period of time managing and administering the FRSD. The facts alleged in this case support an inference that Defendants' actions induced Plaintiffs

to expect to profit from their substantial investment into developing a mutual fund industry in Russia. Plaintiffs have alleged that Hay told them that for their efforts, they could expect to earn up to $2,500,000 from World Bank Funds. Complaint ¶ 52. Plaintiffs also alleged that "Hay indicated that the Consulting Contract was an opportunity for Forum to earn revenues which would support at least a portion of the start-up costs associated with Forum maintaining a high-level staff in Russia to create and operate a specialized depository." Complaint ¶ 47.

Plaintiffs have also sufficiently alleged interference through fraud. Under Maine law a plaintiff alleges evidence sufficient to support a jury finding of fraud for purposes of establishing tortious interference when a defendants "repeatedly promised the plaintiffs that they would receive a permit for the 1994–95 urchin buying season while at the same time entering into formal agreements with other buyers, and that in reliance on [defendants'] assertions, [plaintiffs] failed to make alternative arrangements for urchin buying or to challenge the permit process." *James*, 712 A.2d at 1058. Similarly, Plaintiffs in this case have alleged that Defendants solicited investors from California and around the United States, while simultaneously promising Plaintiffs that they would own (except for any necessary Russian ownership, *e.g.*, 51 percent) and control management of the FRSD. On May 14, 1996, one day after Forum was notified that the Russian SEC had selected its proposal, Hay, Hebert, and Zagachin began offering to sell ownership of the FRSD to Zimmerman and other American investors. Complaint ¶ 56. Specifically, Hebert described the management team of the specialized depository as including herself as Chief Executive Officer and Zagachin as Chief Operating Officer, and she predicted large profits as a result of the management

team's position of trust with the Russian SEC and the hiring of ILBE as a consultant. Complaint ¶ 57. In *James,* the jury was permitted to infer from circumstantial evidence an intent to interfere based on defendants' repeated assurances to the contrary that plaintiffs would be issued a license, while they were accepting money and issuing permits to others. *James,* 712 A.2d at 1058. Another aspect of the fraudulent interference is evidenced by the contention that the Russian SEC, under Shleifer's and Hay's influence, turned down qualified applications to operate mutual funds and specialized depositories in Russia from Credit Suisse First Boston and Pioneer Group, Inc. as a part of a conspiracy to wait for Shleifer and Hay to secure the first licenses for themselves.

Plaintiffs have also alleged interference through intimidation. In August of 1996, a series of events are alleged to have contributed to Plaintiffs' actions in selling their interest in Forum Russia and the FRSD, which they allege was done under duress. Shleifer and Hay told Plaintiffs they had to sell or they would lose their Contract with the Russia SEC. After having been notified in May that Forum had been selected to receive—or at least after July when Forum was granted—the World Bank Contract, Forum expected to earn profits beyond the remuneration provided for in the Contract for consultant services, including profits from the continued management of the FRSD that they helped create. Around August 19, 1996, Hay informed Keffer that Forum Consulting would not be paid under the Consulting Contract unless certain conditions were met, which included Zagachin owning at least 51% of the FRSD, Zagachin managing control of the FRSD, and the FRSD administering Pallada's mutual fund by September 2, 1996. Initially, Keffer told Hay that these demands were unacceptable; however, after the meeting with But-

ler, and exchanges between Keffer and Vasiliev, Plaintiffs determined they had no choice but to sell their interest in the Contract as it was originally construed, *i.e.,* as owners of Forum Russia and the FRSD. Hay's and Zagachin's attempt to transfer Plaintiffs' money before Zagachin was the record owner is further evidence that Defendants were determined either to pressure Plaintiffs or simply go around them in order to gain ownership themselves of the FRSD. After the meetings with Butler, and under pressure from Hay and Vasiliev, Forum eventually sold not only 51%, but all of Plaintiffs' ownership in the new entities they had just created— namely Forum Russia and the FRSD—to a company owned by Zagachin and financed by Hay. Plaintiffs, nevertheless, still thought they would have a role in the Russian mutual fund industry, *i.e.,* as a "subcontractor." Plaintiffs, in fact, continued to work to make the fund operational and expected that they would still be involved with the Consulting Contract, until they realized Hay's influence over Vasiliev. At that point Plaintiffs believed "that they had no choice but to stem their mounting financial losses by selling Forum Russia." Complaint ¶ 79. Plaintiffs have sufficiently alleged damages resulting from the anticipated profits lost by the sale of these entities to the Defendants and their agents. On the basis of these allegations and inferences reasonably drawn from them, the Court finds that Plaintiffs have stated a claim for which relief may be granted on their claim of Tortious Interference with Prospective Economic Advantage (Count V).

### b. Aiding & Abetting Tortious Interference With Prospective Economic Advantage

 Contrary to Defendant Shleifer's assertions, a defendant may be held liable in tort under aiding and abetting

liability theory, even for negligence. Maine has recognized the tort of aiding and abetting a tortious action on the basis of section 876 of the RESTATEMENT OF TORTS. *See Barnes v. McGough*, 623 A.2d 144, 145 (Me.1993); *see also Prawer*, 829 F.Supp. at 457. Section 876 of the RESTATEMENT (SECOND) provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to a third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1979). The Comment on Clause (b) in the RESTATEMENT (SECOND) states,

> If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended [tort] and when it is merely a negligent act.... The rule applies whether or not the other knows his act is tortious. It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act.

RESTATEMENT (SECOND) OF TORTS § 876, comment on clause (b) (1979). Furthermore, this Court has previously held, "as with a claim of civil conspiracy, there must be alleged tortious conduct by another before aiding and abetting liability can be imposed." *Prawer*, 829 F.Supp. at 457. Unlike the Plaintiff in *Prawer*, who failed to allege an independent tort, Keffer and Forum have alleged independent torts to which the aiding and abetting liability can attach. *Id.* In this case, as discussed below, Plaintiffs have sufficiently alleged that Shleifer committed independent actions, including directing and supervising Hay and other agents involved in committing the alleged fraudulent interference with Plaintiffs' prospective economic advantage, and, therefore, that Shleifer is culpable on each of the claims for which Hay must answer. In particular, Plaintiffs have stated a claim for relief on the Aiding and Abetting Tortious Interference with Prospective Economic Advantage (Count VI).

**c. Fraudulent Misrepresentation**

 In order to establish liability in an action for fraudulent misrepresentation under Maine common law, a plaintiff must show that defendant (1) made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relied upon the representation as true and acted upon it to his damage. *Letellier v. Small*, 400 A.2d 371, 376 (Me.1979). Plaintiffs allege that Hay made false representations to them regarding their ownership and control of the proposed mutual fund venture in Russia, which is the material issue in the case. Plaintiffs allege that Hay knew it was false when he told Plaintiffs that they would own and control the proposed mutual fund specialized depository and that they might expect to make millions from this business venture, e.g. he promised that up to $2.5 million dollars in USAID funds would be spent on the Russia Program. The simultaneous attempts to secure alternate investors in the United States, while Hay allegedly promised Plaintiffs that they would own and control

the entire portion not required by Russian law to be held by Russian investors or owners, further corroborate the notion that Hay intentionally misled Plaintiffs. These representations by Hay were allegedly made to induce Forum to invest its time, resources, and expertise in establishing the necessary technical support to launch a mutual fund industry, while denying them an opportunity to profit from their own investment. Plaintiffs have also sufficiently alleged that they justifiably relied on representations made by Hay—in making substantial investments of time, money, staff, and other resources in order to make Forum Russia and the FRSD operational—because they had no reason to know that the statements were ill-motivated or false when made.

■ Under Maine law, "a principal is liable for the fraudulent misrepresentations made by his agent within the scope of the agent's authority, whether or not the principal knows or is unaware of his agent's misconduct." *Crowley v. Dubuc,* 430 A.2d 549, 552 (Me.1981)(citing *Leavitt v. Seaney,* 113 Me. 119, 122, 93 A. 46, 47–48 (Me.1915)). Plaintiffs' claims against Hay apply with equal force to Shleifer because Hay was allegedly Shleifer's agent.

■ Defendants have argued that Plaintiffs have failed to plead their claims of fraud with sufficient particularity as required by Fed.R.Civ.P. 9(b). The Federal Rules have a liberal system of notice pleading, wherein Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiff's claim. *See* Fed. R.Civ.P. 9(b). Rule 9(b) states, "the circumstances constituting fraud or mistake

shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The First Circuit has stated, " 'Rule 9 requires specification of the time, place, and content of an alleged false representation, but not the circumstances of evidence from which fraudulent intent could be inferred.' " *Doyle,* 103 F.3d 186 at 194 (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980)). "[I]n considering a motion to dismiss, the Court must weigh Rule 9 against the general policy of Rule 8 notice pleading." *Driscoll v. Landmark Bank for Savings,* 758 F.Supp. 48, 51 (D.Mass. 1991). "Rule 9(b) does not require the plaintiff to present specific evidence; however, the plaintiff must identify some facts or circumstances to support the allegations of fraud, beyond the mere allegation of corporate mismanagement or general economic downturn." *Driscoll,* 758 F.Supp. at 52 (citations omitted). "Complaints that merely restate the elements of a claim are not sufficient to meet Rule 9(b). Thus, a complaint must make some step toward explaining how and why the statements made by the defendants were false and misleading when made." *Id.* (internal citation omitted).

Plaintiffs have alleged that Hay and Hay's agents made statements to Forum for the purpose of inducing Forum to enter into a contract with the Russian SEC. These statements consisted of promises that, after creating and establishing a specialized depository, Plaintiffs could retain significant management and/or ownership control, from which they could thereby derive substantial profits, above and beyond any contractual prices which would reimburse them for the significant investments of time and money required to set up such an institution from the ground up, including start-up costs. These state-

ments were alleged to have been made by Hay and his agents in March 1996 and again in May through July 1996. Plaintiffs' Complaint has also alleged theories regarding the motives behind the false statements, *i.e.* Defendants were conspiring to defraud Forum of financial profits in order to benefit personally from the endeavor, which conflict-of-interest guidelines squarely forbade them from doing more openly. That is, based on their contractual agreement with USAID, Defendants or their agents were barred from investing personally in the Russia Program operations, so they created and funded other entities, such as Pallada and Oasis for that purpose. It is obvious why such statements would be misleading to Plaintiffs, if Defendants not only intended to benefit themselves, but also offered investment opportunities to American investors other than Plaintiffs. The simultaneity of Hay promising one thing to Plaintiffs, while soliciting other non-Russian investors the very next day, strongly suggests that Hay and his agents knew the statements made to Plaintiff were false at the time they were made. Therefore, Plaintiffs have alleged their claim of fraud with sufficient particularity, and Defendants' Motions to Dismiss on that ground will be denied.

#### d. Aiding and Abetting Fraudulent Misrepresentation

 Plaintiffs have sufficiently alleged that Shleifer may be liable for aiding and abetting any fraudulent representations made by Hay. Plaintiffs have alleged that: (1) Shleifer was directly responsible for the Russia Program, (2) Shleifer was Hay's supervisor, (3) Shleifer and his wife traveled to Russia in connection with the Program, and (4) Shleifer's wife invested in the company that obtained the first mutual fund license. Defendant Shleifer contends that Plaintiffs have failed to allege facts that would show Shleifer was aware of the substance of conversations that Hay had with Forum and Keffer, and that the conspiracy claim is insufficient to establish liability on the part of Shleifer. The tort of misrepresentation requires not only that defendants made a false statement, but also that plaintiffs relied on it to their detriment. *See Salvador v. Meese,* 641 F.Supp. 1409, 1414 (D.Mass.1986), (citing *Kolikof v. Samuelson,* 488 F.Supp. 881, 883 (D.Mass.1980)). Under Maine law, " 'conspiracy' fails as the basis for the imposition of civil liability absent the *actual commission* of some *independently recognized tort.*" *Prawer,* 829 F.Supp. at 455, (citing *Cohen v. Bowdoin,* 288 A.2d 106, 110 (Me.1972)) (emphasis in *Prawer* ). Here, plaintiffs have alleged several tort claims, including that Defendant Shleifer aided and abetted Hay by acting "in concert" with him in committing the alleged torts. Plaintiffs rely on common law agency theory and, alternatively, on a "conspiracy" theory,[27] a "joint tortfeasor," or "joint enterprise" theory. *See* Complaint ¶¶ 101, 116, 117, 129. As discussed above, by alleging that Hay was an employee and agent of Defendant Shleifer, coupled with allegations of Shleifer's direct involvement in the scheme and indirect involvement through helping to finance his wife's investments in the scheme, Plaintiffs have sufficiently alleged that Shleifer thereby committed an independent tort to support their opposition to Defendant Shleifer's motion to dismiss.

---

27. *See Abeloff v. Barth,* 119 F.R.D. 315, 324 (D.Mass.1988) (holding that a claim of conspiracy need not be separately pleaded in order for the co-conspiracy theory of venue to apply and holding that all defendants are properly subject to venue where it may be found over any defendant, *i.e.,* where "any act [was] committed material to and in furtherance of an alleged scheme.")

### e. Negligent Misrepresentation and Aiding & Abetting Negligent Misrepresentation

 Maine has adopted section 552 of the RESTATEMENT (SECOND) OF TORTS as the appropriate standard for negligent misrepresentation claims, which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Perry v. H.O. Perry & Son Co.*, 711 A.2d 1303, 1305 (Me.1998) (citing RESTATEMENT (SECOND) OF TORTS § 552(1) (1977). Because Hay allegedly (1) made representations directly to Plaintiffs, (2) sent his agents to Maine, and because (3) while in Maine, these agents also allegedly made representations, upon which Plaintiffs allegedly relied to their detriment, Plaintiffs have stated a claim for relief on this count. Shleifer's supervisory role and his personal economic interests in the deal sufficiently implicate him in Hay's and/or their agents' negligence for the purposes of this Motion to Dismiss.

### f. Vicarious Liability Based on Apparent Authority

 As a preliminary matter, Harvard may be vicariously, or derivatively, liable for actions taken by its agents, Shleifer and Hay. Under Maine law, "[a]gency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Perry*, 711 A.2d at 1305 (citing *Desfosses v. Notis*, 333 A.2d 83, 86 (Me.1975)). An employer may be vicariously liable for the negligence of its employees. *See Legassie v. Bangor Publishing Co.*, 741 A.2d 442, 444 (Me.1999) (citing *Bonk v. McPherson*, 605 A.2d 74, 78 (Me.1992) (referring to RESTATEMENT (SECOND) OF TORTS §§ 409–)). Plaintiffs have credibly alleged that Harvard held out its employees—Shleifer and Hay—as cloaked with apparent authority to act on the institution's behalf and good name to conduct the business of administering and carrying out the USAID contracts. Therefore, to the extent that Plaintiffs have alleged their *prima facie* case against Shleifer and Hay and by positing that Harvard failed to properly supervise, oversee or control Shleifer, Hay and their agents, Harvard may be liable in tort to Plaintiffs.

 Defendant Harvard contends that it has no vicarious liability in this case because Maine law provides no respondeat superior liability for employers. Defendants rely on *Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441, 443–44 (Me.1997), for the proposition that Maine courts "have never decided that the negligent supervision of an employee constitutes an independent basis for liability on the part of an employer." *Id.* Defendants have not accurately characterized the Maine law of respondeat superior. An employer could still be vicariously liable for actions of an employee based on agency principles. In Maine, "[u]nder the doctrine of respondeat superior, liability for tortious acts of a servant may be imputed to the master, [citations omitted] and the acts of an agent may be imputed to the principal." *DiCentes v. R. P. Michaud*, 719 A.2d 509, 513 (Me.1998) (citing to W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS §§ 69, 70, at 499, 501 (5th ed.1984); *Bonk*, 605 A.2d at 78). Maine recognizes the doctrine of apparent agency

wherein "the principal knowingly or negligently holds someone out as possessing authority to act for him or her, even though no actual authority has been given." *Williams v. Inverness Corporation,* 664 A.2d 1244, 1246 (Me.1995) (citing *Twin Island Dev. Corp. v. Winchester,* 512 A.2d 319, 324 (Me.1986)).

Defendant Harvard argues that Shleifer and Hay had no apparent authority to act on Harvard's behalf and that Harvard had no knowledge of their activities. Plaintiffs respond that Harvard is liable on an agency theory for tortious acts committed by its employees, who were cloaked with apparent authority to act on behalf of Harvard. Shleifer and Hay transacted business with Plaintiffs and others using Harvard and HIID letterhead, business cards, and credentials and were otherwise conducting various activities under the apparent aegis of Harvard. Therefore, Plaintiffs have sufficiently alleged that Shleifer and Hay had the apparent authority from Harvard to engage in the subject business dealings with Plaintiffs.

### g. Vicarious Liability Based on Scope of Employment

 Defendant Harvard argues that it is not liable to Plaintiffs because Shleifer, Hay, and other Harvard employees were acting outside the scope of their employment when they allegedly committed the aforementioned torts, including, *inter alia,* usurping personal opportunities for profit in violation of Harvard's and USAID's conflict-of-interest policies. Maine law does recognize vicarious liability for an employer under an intentional tort theory for an employee's actions while acting within the scope of his employment or when the employee acts outside the scope of employment if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or *he was aided in accomplishing the tort by*

*the existence of the agency relation." McLain v. Training and Development Corp.,* 572 A.2d 494, 498, (Me.1990)(citing RESTATEMENT (SECOND) OF AGENCY, § 219 at 481 (1958) (emphasis in *McLain* ). Plaintiffs point out that Shleifer's and Hay's express authority and responsibilities for HIID included obtaining and hiring subcontractors to help administer the USAID Russia Project. Therefore, Plaintiffs maintain, the solicitation and business dealings surrounding Forum's involvement with the Russia Program were well within the scope of Shleifer's and Hay's responsibilities, and Harvard had a duty to supervise them properly. Plaintiffs' only burden at this stage with regard to knowledge is to allege that Harvard knew or *should have known* of Shleifer's and Hay's dealings with Plaintiffs, the statements made to Plaintiffs, and subsequent financial arrangements involving Harvard staff's pecuniary interest. Plaintiffs have alleged significant abuses of USAID funds, and high-level mismanagement of the HIID Russia Program. Whether Hay and Shleifer actually acted outside the scope of their employment will have to be addressed more precisely when the evidentiary record is more developed. At this time, however, Harvard has failed to sufficiently support such a defense.

### h. Negligence

 Defendant Harvard avers that it owed no duty to Plaintiffs and, therefore, cannot be liable for negligence. In Maine, "the necessary elements of a cause of action for negligence are a duty owed, a breach of that duty proximately causing the plaintiff's injuries and resulting damages." *Macomber v. Dillman,* 505 A.2d 810, 812 (Me.1986) (citations omitted). Under Maine common law, negligence does not exist in the abstract, and whether one party owes a duty of care to another is

a question of law. *Williams*, 664 A.2d at 1246 (citations omitted). Plaintiffs assert that Harvard's duty to the public and to subcontracting businesses stems from its holding out the ILBE, the HIID Russia Project, and other projects funded by USAID as legitimate, Harvard-sponsored enterprises. Plaintiffs allege that Defendants Shleifer and Hay were acting within the scope of their employment, thereby implicating their employer in their tortious actions. *See McLain*, 572 A.2d at 497; *Nyer v. Carter*, 367 A.2d 1375, 1378 (Me.1977)(citing *Harlow v. Perry*, 114 Me. 460, 463, 96 A. 775, 776 (1916)). Plaintiffs have not offered specific proof that Harvard knew of Shleifer's and Hay's actions, but Plaintiffs have credibly alleged that Harvard should have known of their actions. Plaintiffs have made sufficient allegations of a general duty owed to the public in its business transactions and of wrongful conduct on Harvard's part to justify denial of the Motion to Dismiss on this ground.

### 6. Punitive Damages

■ Defendants claim that Plaintiffs are not entitled to punitive damages as claimed in Count X. With regard to Harvard's, Shleifer's, and Hay's liability for punitive damages, the Supreme Court has held,

> The Restatement of Agency places strict limits on the extent to which an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages:
>
>> Punitive damages can properly be awarded against a master or other principal because of an act by an agent, if, but only if: (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was em-

ployed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

*Kolstad v. American Dental Association*, 527 U.S. 526, 542–43, 119 S.Ct. 2118, 2128, 144 L.Ed.2d 494 (1999)(holding that common law agency principles limit vicarious liability for punitive awards)(citing RE-STATEMENT (SECOND) OF AGENCY (1957), § 217C; RESTATEMENT (SECOND) OF TORTS § 909 (1977)). An evidentiary showing is necessary to discern whether a plaintiff qualifies for a punitive award, and the standards for imputing liability to an employer in the punitive damages context necessarily require more facts than are before the Court on this Motion to Dismiss. *Id.* 527 U.S. at 540, 119 S.Ct. 2118; *see also Kopenga v. Davric Maine Corporation*, 727 A.2d 906, 911 (Me.1999) (vacating punitive damage award under the Maine Human Rights Act because employer had no knowledge of wrongdoing). Plaintiffs allege that Shleifer and Hay were acting in the scope of their employment when they contacted Forum and commenced a business relationship. Defendants were authorized by Harvard to subcontract with businesses for transactions with the Russia Program. Plaintiffs have alleged that Harvard knowingly authorized Shleifer and Hay to act on behalf of the Russia Program.

■ Maine law recognizes the availability of punitive damages based upon tortious conduct only if the defendant acted with malice, express or implied. *Tuttle v. Raymond*, 494 A.2d 1353, 1354 (Me. 1985). Punitive damages based on implied malice is available "where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of

that conduct can be implied." *Id.* 494 A.2d at 1361; *see also, Larose v. Berman,* 123 Me. 187, 122 A. 433 (1923) (upholding punitive damages for a tenant against a landlord whose agent willfully committed a tortious act where landlord authorized agent's actions). Under Maine law, a defendant may be liable for punitive damages "if his agent acted willfully, but only in case the acts complained of were authorized by the defendant." *Larose,* 123 Me. 187, 122 A. 433. The Restatement further provides that "a principal may be liable for punitive damages if it authorizes or ratifies the agent's tortious act, or if it acts recklessly in employing the malfeasing agent. The Restatement also contemplates liability for punitive awards where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'" *Kolstad,* 527 U.S. at 543, 119 S.Ct. at 2128. Plaintiffs have alleged actions by Shleifer, Hay, and their agents, including the existence of a conspiracy to defraud Plaintiffs and intentionally manipulating the business relationship sufficient for the Court to infer implied malice on Defendants' part. The details of whether Harvard authorized Defendants Shleifer's and Hay's specific conduct, as opposed to generally holding them out as agents or whether malice on Harvard's part can be implied cannot be determined at this stage of the case. Plaintiffs have sufficiently alleged the requisite agency and employment relationships necessary to potentially implicate Harvard, and, therefore. Defendants' Motion to Dismiss the claim for punitive damages is denied without prejudice at this time.

## C. Affirmative Defenses

### 1. Failure to Include Indispensable Party in Count VI: Aiding and Abetting Tortious Interference

■ Defendants argue that Forum Consulting, Forum Russia, Vasiliev, and the Russian SEC are indispensable parties because the claims should have been brought by or against them in Contract, and because they are "the only persons (and entities) who could put the lie to these allegations." Docket No. 5 at 24. Defendants are mistaken because, even assuming Vasiliev or other members of the Russian SEC may be necessary witnesses in their defense, that does not make them indispensable parties to this action, which is not a contractual claim. Nor is it clear to the Court that Defendants have shown that these corporations even still exist, after having been sold by Plaintiffs to Zagachin and the names apparently changed. This Motion will be denied because Defendants have not shown why these parties are indispensable in this action.[28]

### 2. Act of State Doctrine

■ Defendants have introduced the act of state doctrine as a defense to this action. Having raised the act of state doctrine as an affirmative defense, the burden of proof rests on Defendants to justify its application. *See Bigio v. Coca Cola Co.,* 239 F.3d 440, 453 (2d Cir.2000)(citing *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)). The United States Supreme Court has made clear that "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of

---

**28.** In the event that Shleifer and/or Hay are successful in their motions, Harvard has moved to dismiss pursuant to Fed.R.Civ.P. 19 for failure to join an indispensable party, *i.e.,* Shleifer and Hay. Because Defendants Shleif- er's and Hay's Motions to Dismiss will be denied, Defendant Harvard's Rule 19 argument is moot and does not warrant further discussion.

official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corporation, International,* 493 U.S. 400, 406, 110 S.Ct. 701, 705, 107 L.Ed.2d 816 (1990) (emphasis in original). Defendants have presented no evidence that any official action by a foreign sovereign is an issue on which this Court must rule, let alone that the outcome of the case turns upon such an action. Defendants have failed to offer any evidence to establish that the essence of these claims require the Court to pass on the legitimacy of a foreign act of state. They have instead merely proffered conclusory statements alleging that Shleifer and Hay are agents of Vasiliev and, therefore, agents of a foreign sovereign. This falls far short of the necessary burden Defendants carry on this issue. Plaintiffs have alleged, regardless of any actions by the Russian SEC to terminate their contract, that Hay made certain misrepresentations to Forum. Moreover, the Contract with the Russian SEC is not itself in issue in this litigation; rather, it is the alleged tortious interference therewith, as well as other tortious conduct on the part of Defendants, that are at issue here. The Court finds the act of state doctrine inapplicable as an affirmative defense upon the evidence in the record currently before the Court, and will deny Defendants' Motion to Dismiss on this ground.

### 3. Release Agreement/Enforceability of the Contract Waiver

Defendants argue that the Release Agreement bars each of Plaintiffs' claims because they are "connected to," "in connection with," or made "under" Plaintiffs' Contract with the Russian SEC. Plaintiffs contend that the recovery they seek is not on the contract and, therefore, that the Release Agreement they execut-ed with the Russian SEC does not bar this action. Docket No. 8 at 20. Specifically. Plaintiffs maintain that their claims: (1) do not involve the consulting services rendered pursuant to the Consulting Agreement executed on July 25, 1996, and (2) rather, they involve Defendants' alleged misrepresentations that Plaintiffs would own, and control the management of, the FRSD. Plaintiffs further contend that, even if the Contract is relevant to their claims, the Release Agreement is specific and relates only to issues regarding the "performance and payment for services rendered" under the Consulting Contract and that they are seeking to recover for a broader and different type of claim. The Law Court has held that parties may contractually limit negligence liability where the plain language of the agreement " 'expressly spell[s] out with the greatest particularity the intention of the parties contractually to extinguish negligence liability.' " *Hardy v. St. Clair,* 739 A.2d 368, 369–70 (Me.1999) (quoting *Doyle v. Bowdoin College,* 403 A.2d 1206, 1207 (Me.1979)(internal quotations omitted)). In *Hardy,* the parties contracted to release the defendants from any and all claims "arising out of" or "related to" the events at issue. *Id.* 739 A.2d at 370. Further, in *Hardy,* there was other broader language indicating that the agreement was to be " 'A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.' " *Id.* The Release at issue in the case at bar significantly differs from the release in *Hardy.* The Release is specifically addressed to "claims... or causes of action of every kind and nature in connection with the Contract." Docket No. 30, Ex. B. This language is insufficient to plainly and unequivocally release claims for damages not based on the Contract. In sum,

Plaintiffs have brought no contractual claims in their Complaint and, therefore, the specific provisions in the Release relating to such claims do not now appear to bar these claims.

### 4. Immunity as a Nonprofit, Charitable Organization

Defendant Harvard has also claimed immunity as a nonprofit, charitable organization. Under Maine common law, the defense of charitable immunity is an affirmative defense that a corporate defendant must plead and prove in order to escape liability under that doctrine. *See Isaacson v. Husson College,* 297 A.2d 98, 102 (Me.1972). As the Law Court has explained, "in order to qualify for charitable immunity, an institution, must, *inter alia,* derive its funds 'mainly from public and private charity.'" *Thompson v. Mercy Hospital,* 483 A.2d 706, 707 (Me.1984) (citations omitted). Defendant Harvard has failed to carry its burden of establishing, on this record, that it derives its funds mainly from charity and, therefore, the affirmative defense of charitable immunity is inapplicable to it in this case.

### IV. CONCLUSION

It is **ORDERED** that Defendants' Motions to Dismiss be, and they are hereby, **DENIED.** It is further **ORDERED** that Defendants' Motions to Transfer be, and they are hereby, **DENIED.** Finally, Defendant Hay's Motion to Strike Plaintiff's Supplemental Memorandum be, and it is hereby, **DENIED.**